**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **DOREN W. JAMES,** | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | **C.A. No 25-cv-** |
| | : | |
| **JONATHAN DOIRON, alias,** | : | |
| **individually and in his official capacity** | : | **Jury Trial Demanded** |
| **as a police officer in the Lincoln Police** | : | |
| **Department; STEVEN BRADLEY,** | : | |
| **alias, individually and in his official** | : | |
| **capacity as a police officer in the** | : | |
| **Lincoln Police Department** | : | |
| *Defendants* | : | |

**VERIFIED COMPLAINT**

**I.      Introductory Statements**

1.      This action is brought by Plaintiff Doren W. James ("Plaintiff" or "Mr. James") seeking declaratory and injunctive relief and compensatory and punitive damages for acts and/or omissions of Defendants committed in violation of Plaintiff's right to be free from unreasonable search and seizure through the application of excessive force under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, and for violation of the common law of the State of Rhode Island for assault and battery.

2.      This action is brought because on November 25, 2022, Mr. James was arrested by Defendant Lincoln police officers following an entirely false accusation of domestic abuse made by the mother of two of Mr. James' children.  During that arrest, despite Mr. James being cooperative and compliant, Defendant Lincoln police officers subjected Mr. James to an unreasonably hostile and forceful arrest, during which Mr. James was handcuffed extremely tightly.  After Mr. James repeatedly complained about the handcuffs being too tight, the handcuffs were *tightened* and not loosened until after Mr. James was taken to the Lincoln police station for

**Page 1 of 11**

processing.  This unreasonable use of force caused Mr. James to suffer extreme pain and a wrist injury that continues to cause him pain, weakness, and limits the use of his right hand.

## II.      Parties

3.      Plaintiff Doren W. James ("Plaintiff" or "Mr. James") is a resident of the Town of Lincoln, County of Providence, and State of Rhode Island.

4.      Defendant Jonathan Doiron, alias ("Defendant Doiron"), is sued individually and in his official capacity as a police officer in the Lincoln Police Department.

5.      Defendant Steven Bradley, alias, ("Defendant Bradley"), is sued individually and in his official capacity as a police officer in the Lincoln Police Department.

## III.      Jurisdiction

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 and 2202.

## IV.      Venue

7.      Venue is proper in this Court insofar as, on information and belief, all of the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. § 1391.  Venue is also proper because all of the acts and/or omissions giving rise to the claims herein occurred in the District of Rhode Island.

## V.      Material Facts

8.      On November 25, 2022, Defendants Doiron and Bradley, along with at least two additional Lincoln police officers, Officers John Sexton and Victoria Platt, responded to a call for domestic violence from Ms. Crystal Icard, the mother of two of Mr. James' children.

9.      Mr. James's two minor children were both living with him at the time of this incident.

10.      His oldest child, who is an adult, was also visiting at the time of this incident.

**Page 2 of 11**

11. At the time of this incident, Mr. James' youngest son was nine (9) years old, his middle daughter was fifteen (15) years old, and his oldest son was twenty-two (22) years old.

12. According to Defendant Doiron, Ms. Icard alleged that she and Mr. James began arguing in his apartment when she returned his car to him and accused Mr. James of grabbing her by the throat and throwing her out of the apartment.

13. Defendants Doiron, Bradley, and Officer Sexton then approached Mr. James's apartment to speak with him and asked him to step outside of his apartment.

14. Mr. James, a sixty-nine (69) year old man at the time, expressed that he did not want to step into the hallway where his neighbors could hear and asked the officers to come into his apartment where all three of his children were present.

15. Mr. James explained to the police officers that he and Ms. Icard got into a verbal disagreement when she returned his car without any gasoline and he told her she needed to leave.

16. Defendant Doiron asked Mr. James how he got Ms. Icard out of the apartment.

17. Mr. James responded that when he walked out the front door, Ms. Icard followed; he then quickly backtracked and shut the door behind him with her on the other side.

18. Without attempting to ask the children any questions, Defendant Doiron grabbed Mr. James's left wrist and then told Mr. James that he was under arrest.

19. Defendant Doiron quickly placed handcuffs on Mr. James's left wrist before putting his arm behind his back.

20. Defendant Doiron then immediately pushed Mr. James up against a set of closed French doors, while holding Mr. James's left wrist and yelling "stop resisting."

21. Immediately next to the French doors was a small table with a microwave on it, which was surrounded by several sets of winter shoes.

22. Because of the shoes, Mr. James was unable to step close to the wall and was instead pushed face-first toward the wall; Mr. James quickly turned his head to the left to avoid hitting the wall with his face and hit the wall with the right side of his head and his right shoulder at the same time.

23. Once against the wall, Mr. James reached his right arm out to allow Defendant Bradley to grab his right wrist, pull it behind his back.

24. Defendant Doiron then completed handcuffing Mr. James's right hand behind his back.

25. Mr. James immediately began to complain while he was in the apartment that the handcuffs were too tight, but he was entirely ignored by all four officers, including Defendants.

26. Defendant Doiron testified that Mr. James did not struggle at all once the handcuffs were placed on his wrists.

27. Defendant Doiron also admitted under oath that Mr. James complained that his wrist and shoulder hurt.

28. Mr. James's daughter also testified under oath that Mr. James complained multiple times in the apartment that his wrist and his arm were in pain.

29. She also asked the officers if they could loosen the handcuffs, but she too was ignored.

30. Defendants Doiron and Bradley, as well as Officers Sexton and Platt, all heard Mr. James's repeated complaints about wrist pain in the apartment, but none of them took any action to loosen the handcuffs while Mr. James was in his apartment.

31. After Mr. James was handcuffed and allowed to stand up straight, Defendants Bradley and Doiron began walking him out of the apartment, despite the fact that he was only

wearing pajama pants and a pajama shirt, with no socks, shoes, or coat and did not have his glasses, which had been knocked off of his face when Defendants' arrested him.

32.     On his way out of the apartment, Mr. James asked his daughter to bring him his glasses.

33.     Defendants walked Mr. James out of the apartment, down the hall, and down the stairs, with Bradley walking in front of Mr. James and Defendant Doiron walking to the left and behind, holding his left arm.

34.     Mr. James continued to complain about how tight and painful the handcuffs were in the hallway and while going down the stairs.

35.     Apparently in response to these pleas about the handcuffs, when Mr. James reached the bottom of the stairs, Defendant Doiron stopped him, grabbed hold of the handcuffs, and tightened the cuffs on both wrists.

36.     Mr. James immediately exclaimed in response to the increased pain, "Ow! Come on, man!"

37.     At that point, Mr. James's right wrist began to hurt much worse than his left wrist.

38.     Mr. James' three children could hear Mr. James complaining about his wrists in the apartment, out of the apartment, down the stairs, and outside the apartment building.

39.     Mr. James' daughter stayed behind to gather socks, shoes, and a hoodie for her father.

40.     It took her several minutes to find Mr. James's glasses because they had flown off his face during the arrest.

41.     Mr. James was taken outside and walked to one of the police cruisers where there were many police officers, even more than had been inside his apartment.

42.    Defendant Doiron left Mr. James with Defendant Bradley standing next to one of the police cruisers.

43.    At that point, Mr. James's wrist was in so much pain that he began stomping his foot, and said to Defendant Bradley, "Oh my god, these are too tight.  I wish someone would loosen them."

44.    After complaining multiple times about the pain, Defendant Bradley finally said, "We need to loosen these handcuffs."

45.    Defendant Doiron immediately responded, "Don't unhandcuff him!  Leave him in the handcuffs.  He's a wimp."

46.    Defendant Bradly then manipulated the handcuffs and Mr. James's arms.

47.    However, Defendant Bradley only pretended to loosen the handcuffs; he did not actually loosen them or do anything to relieve the pressure on Mr. James's wrists.

48.    At that point, Mr. James realized that Defendants had no intention of loosening his handcuffs, and stopped complaining, despite being in an extreme amount of pain.

49.    Defendants then placed Mr. James in a police car and Defendant Doiron drove away from the scene with Mr. James in the back.

50.    Mr. James's children came outside to try and speak with him and bring him clothes, shoes, and glasses, but he had already been taken away.

51.    While driving toward the police station, Defendant Doiron stopped the car near Lincoln High School and waited for approximately ten to fifteen (10-15) minutes before continuing on toward the police station.

52.    Mr. James arrived at the police station about fifteen to twenty minutes (15-20) after he was placed in a police car and driven away.

53.     The entire time he was in extreme pain due to the tightness of the handcuffs, especially on his right wrist.

54.     The handcuffs were only loosened when they were removed for processing approximately five to ten (5-10) minutes after he arrived at the police station.

55.     When Mr. James was placed in a cell after processing, he continued to experience extreme pain in his right wrist.

56.     His children arrived at the police station an hour or two after Mr. James but were not allowed to speak to him or to give him any clothes, shoes, or his glasses and eventually left, being told they would be contacted when they could see their father.

57.     Late that night Mr. James was released after seeing a Justice of the Peace and called his children who met him at the jail with his clothes, shoes, glasses, and money for bail.

58.     Defendants and the Town of Lincoln charged and prosecuted Mr. James with three misdemeanor charges: Count 1, domestic violence, simple assault and/or battery; Count 2, domestic assault disorderly; and Count 3, resisting arrest.

59.     At the start of the trial, the prosecutor for the Town of Lincoln dismissed Count 1, domestic violence simple assault and/or battery; amended Count 2, from domestic assault disorderly conduct to straight disorderly conduct; and continued to prosecute Mr. James for Count 3, resisting arrest.

60.     At the conclusion of trial, Judge McCaffery dismissed all charges, finding that Mr. James had not engaged in disorderly conduct when he had an argument with Ms. Icard, and that he did not resist arrest because he had been grabbed before being told he was under arrest and was, at all times after being told he was under arrest, under the control of the Defendants and the other officers.

***Right Wrist Injury***

61. Following his arrest, Mr. James began to feel pain radiating from the radial aspect of his right wrist (near his thumb) down into his hand, swelling, tingling, and numbness in his right wrist and hand.

62. When he met his children after being released from the Lincoln Police Station, he immediately complained of extreme pain in his right wrist and asked his children to take him to Rhode Island Hospital.

63. At Rhode Island Hospital Mr. James's wrist was examined and he was told to speak to his primary care provider ("PCP") and get a referral to a specialist to determine the extent of the damage and what could be done.

64. Mr. James's PCP, Laura Ofstead, M.D., referred him to Steven Graff, M.D., a specialist in orthopedic surgery for hands and upper extremities.

65. Dr. Graff diagnosed his right wrist with neuropraxia, direct contusion of the right dorsal sensory branch of the radial nerve around the level of the radial styloid.

66. Mr. James was initially told that it could take up to a year or a year and a half for the symptoms to resolve.

67. Over the next year, Mr. James's pain, numbness and weakness in his right wrist and hand increased.

68. Mr. James's right wrist continues to cause him pain, to suffer numbness and weakness, and to be of limited use and has continued to seek treatment for it through the date of the filing of the within Complaint.

***Intentional Conduct***

69. At all relevant times, Defendants acted intentionally, willfully, maliciously, and/or with deliberate, reckless, or callous indifference to Plaintiff's clearly established rights.

70.     Specifically, Defendants Bradley and Doiron put handcuffs on Mr. James's wrists, heard his complaints of wrist pain and intentionally took no immediate action to loosen the handcuffs.

71.     Defendant Doiron, instead of loosening the handcuffs in response to Mr. James's complaints, tightened the handcuffs, causing even more pain, especially to Mr. James's right wrist.

72.     Once outside, Defendant Bradley acknowledged the need to loosen Mr. James's handcuffs but did not do so.

73.     Instead, Defendant Bradley intentionally and cruelly pretended to loosen Mr. James's handcuffs, but did not do so, causing Mr. James to remain in extreme pain until after he was taken to the Lincoln police station.

74.     Furthermore, at all relevant times, Defendants knew or should have known that their conduct would cause or contribute to the deprivation of Plaintiff's clearly established constitutional rights.

75.     At all relevant times, Defendants were motivated by malice, wantonness and/or willfulness of an extreme nature.

### *Harm and Damages*

76.     As a direct and proximate result of the Defendants' acts and/or omissions, including but not limited to those described herein, Plaintiff has suffered and will continue to suffer personal injury, pain and suffering, emotional distress, continuing fear of police harassment, cruelty, and excessive force being employed against him, deprivation of his constitutional and common law rights, and has been forced to incur expenses for legal services.

### VI.     Claims for Relief

77.     Plaintiff incorporates in the counts below the allegations contained in ¶¶ 1 through 76 above.

## COUNT ONE
### *Violation of the Fourth and Fourteenth Amendment Right to be Free From Unreasonable Search and Seizure, Actionable Pursuant to 42 U.S.C. § 1983*

78.     Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have violated Plaintiff's right to be free from unreasonable search and seizure through the imposition of excessive force, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

## COUNT TWO
### *Common Law Assault*

79.     Defendants, by their acts and/or omissions, including but not limited to those described herein, placed Plaintiff in reasonable fear of imminent bodily harm, and thereby committed an assault upon Plaintiff, causing Plaintiff to sustain harm as aforesaid.

## COUNT THREE
### *Common Law Battery*

80.     Defendants, by their acts and/or omissions, including but not limited to those described herein, intended to cause and in fact caused a harmful and offensive touching of and trauma upon Plaintiff's body without consent or privilege, and thereby committed a battery upon Plaintiff, causing Plaintiff to sustain harm as aforesaid.

## VII.     Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1.     A declaratory judgment that the actions of Defendants complained of herein violated Plaintiff's right to be free from unreasonable search and seizure, including excessive force, and constituted common law assault and battery.

**Page 10 of 11**

2.        Preliminary and permanent injunctions directing the Defendants not to engage in any further violations of Plaintiff's right to be free from unreasonable search and seizure, including freedom from the application of excessive force.

3.        An award of compensatory damages.

4.        An award of punitive damages.

5.        An award of reasonable attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988.

6.        Such other and further relief as this Court deems just and proper.

### VIII.   Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

### IX.    Designation of Trial Counsel

Plaintiff hereby designates Chloe A. Davis, Esquire, as trial counsel.

> Plaintiff,
> By his attorneys,
> **SINAPI LAW ASSOCIATES, LTD.**

**Date: November 24, 2025**          /s/ **Chloe A. Davis**
**Chloe A. Davis, Esq. (#9334)**
**Richard A. Sinapi, Esq. (#2977)**
2374 Post Road, Suite 201
Warwick, RI 02886
Phone: (401) 739-9690;
FAX: (401) 739-9040
Email: cad@sinapilaw.com; ras@sinapilaw.com

**Page 11 of 11**